UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELIZABETH CAPITAL SUCCESS LLC,<br><br>Plaintiff,<br><br>v.<br><br>FLAGSTAR BANK, N.A.,<br><br>Defendant. | Case No. 26-cv-9176<br><br>**COMPLAINT** |

Jeffrey A. Udell
Siobhan J. Allen
**WALDEN HARAN WILLIAMS LLP**
250 Vesey Street, 27th Floor
New York, NY 10281
Tel: (212) 335-2030
judell@whwllp.com
sallen@whwllp.com

*Attorneys for Plaintiff Elizabeth Capital Success LLC*

**TABLE OF CONTENTS**

**Pages**

PRELIMINARY STATEMENT ....................1

JURISDICTION AND VENUE ....................6

PARTIES AND RELEVANT NON-PARTIES ....................6

STATEMENT OF FACTS ....................7

A. Nussbaum's Relationship with Flagstar ....................7

B. Nussbaum and Steiner's Commencement of the IOLA Scheme ....................9

C. The Escrow Agreement Fraud ....................11

D. The Joint Venture Fraud ....................13

E. The Unraveling of the IOLA Scheme ....................15

F. Flagstar's Awareness of the Fraud and Nussbaum's Breaches of Fiduciary Duty ....................15

G. Closure of the IOLA Account and Elizabeth Capital's Continued Losses ....................20

H. Flagstar's Assistance in Continuing the Fraud and Breaches of Fiduciary Duty ....................22

1) Round-Trip Transactions ....................24

2) Family Payments ....................26

3) Tuition Payments ....................29

4) Payments to Charities and Religious Institutions ....................31

5) Mortgage Payments ....................31

6) Payments to Blacklisted Entities ....................32

7) Payments to Steiner's Entities ....................33

8) Other Personal Expense Payments ....................38

9) Immediate Transfers of Elizabeth Capital's Funds ....................39

FIRST CAUSE OF ACTION (Aiding and Abetting Breach of Fiduciary Duty) ....................44

SECOND CAUSE OF ACTION (Aiding and Abetting Fraud) ....................................................45

THIRD CAUSE OF ACTION (Negligence) ....................................................................46

FOURTH CAUSE OF ACTION (Commercial Bad Faith) ..........................................................47

PRAYER FOR RELIEF ........................................................................................................48

DEMAND FOR JURY TRIAL ..............................................................................................48

Plaintiff Elizabeth Capital Success LLC ("Elizabeth Capital") by its attorneys, Walden Haran Williams LLP, as and for its Complaint against Defendant Flagstar Bank, N.A. ("Flagstar"), alleges as follows:

## PRELIMINARY STATEMENT

1. This case seeks to hold Defendant Flagstar accountable for its role in the multi-million-dollar Ponzi scheme orchestrated by now-disbarred New York City attorney Mark J. Nussbaum ("Nussbaum") and now-deceased New York City businessman, Mendel Steiner ("Steiner"). Through their fraudulent scheme, Nussbaum, Steiner, and Flagstar defrauded Elizabeth Capital and others out of hundreds of millions of dollars.

2. As part of their fraudulent scheme, Nussbaum and Steiner induced Elizabeth Capital to make deposits into an IOLA trust account that Nussbaum maintained at Flagstar for his law firm, Nussbaum Lowinger LLP ("Nussbaum Lowinger").

3. Nussbaum did not use the account, ***1550 (the "IOLA Account"), as a regular IOLA Account. Instead, the IOLA Account operated as the lynchpin for Nussbaum's and Steiner's fraudulent scheme (the "IOLA Scheme").

4. Nussbaum used the IOLA Account to misappropriate deposits from Elizabeth Capital and participate in a series of criminal and otherwise fraudulent schemes including illegal property flips, partnership buy-out transactions, a Ponzi scheme to market fictitious investments to Elizabeth Capital, and extensive commingling of Nussbaum's personal and fiduciary funds.

5. Since his arrest and disbarment, Nussbaum has admitted to the IOLA Scheme, stating *under oath*:

> From mid-2022 until mid-2025, Creditors deposited funds in the IOLA trust accounts. . . or other escrow accounts that the Law Firms maintained at Signature Bank/Flagstar Bank and later Customers Bank. Many of the Creditors were introduced to me by Mendel Steiner, a now-deceased Brooklyn businessman who was a

> client of the Law Firm in a number of real estate transactions. Over a period of approximately three years, the Creditors deposited in excess of $437,630,000 in my IOLA Account.
>
> Certain Creditors were presented with fictitious investment opportunities regarding supposed "proof of funds" transactions or purchases of real property that did not really exist . . . Often the money deposited by the Creditors was used to make short-term bridge loans to third parties. Phony emails, escrow agreements, and deal documentation were used; non-existent third parties in whose names the deals were supposedly being done were invented; and new Creditor monies coming into the IOLA Account were used to return some of the original Creditors' deposits.
>
> From mid-2022 until early mid-2025, I transferred approximately $336,731,000 of monies belonging to the Creditors out of my law firm IOLA Account to bank accounts maintained at JPMorgan Chase Bank by Real Green Management Corp. and Aven Realty 1, LLC. Real Green and Aven Realty were companies that I understood to be owned, operated or controlled by Mendel Steiner. I also transferred approximately $24,025,000 either directly to Mendel Steiner, or to companies that I was told were owned by members of his family. There was no consideration or business reason for any of these transfers. I now understand that the Creditors to whom the funds belonged did not authorize, consent to, or even know about these transfers.

*See ABCMN LLC v. Real Green Mgmt. Corp and Aven Realty 1 LLC*, Index No. 656436/2025, NYSCEF No. 14 at 2-3 (Jan. 28, 2026).

6. Elizabeth Capital was a victim of the IOLA Scheme. Between November 2023 and January 2025, Elizabeth Capital wired a collective total of $200,530,000.00 to the IOLA Account, which was supposed to be safeguarded by Nussbaum and his law firm, pursuant to their fiduciary duties.

7. Nussbaum stole $148,830,000.00 of those deposits.

8. Elizabeth Capital's $148,830,000.00 was diverted out of the IOLA Account.

9. Without the theft of Elizabeth Capital's funds, Nussbaum could not have carried out the IOLA Scheme.

10. In January 2025, after Steiner's death, Elizabeth Capital first learned of the IOLA Scheme, when it became public.

11. But Defendant Flagstar had actual knowledge of the IOLA Scheme far before January 2025.

12. Throughout the course of the IOLA Scheme, Flagstar's own employees documented and voiced extensive concerns regarding the evidently improper activity in the IOLA Account.

13. Upon information and belief, on no fewer than ten separate occasions from 2022 through 2025, Flagstar contacted Nussbaum with concerns about the use of client escrow funds in fraudulent or suspicious transactions. These included, for example and without limitation, round-trip transactions where millions of dollars were sent to and from the same account on the same day or within days of each other, incomplete information on checks, hundreds of thousands of dollars to and from various charitable organizations, and regular payments to Nussbaum's mother.

14. On each occasion in which Flagstar compliance personnel raised a concern, Timothy Collins ("Collins"), then the Flagstar Vice President with responsibility for the Bank's relationship with Nussbaum's account, would contact Nussbaum personally either shortly before, or shortly after, Nussbaum received the inquiry. And Collins would make it go away.

15. Not only would Collins warn Nussbaum about Flagstar's inquiries, Collins would assist Nussbaum in concealing his fraudulent and illegal transactions. When Flagstar inquired about the transactions, Collins would tell Nussbaum to, in substance, give as little information as possible, so Collins could make the inquiry "go away." Flagstar thus permitted Nussbaum to operate and abuse his IOLA Account—the central vehicle for the fraudulent IOLA Scheme—

despite its actual knowledge that there was significant suspicious activity in the IOLA Account, which Collins deliberately concealed.

16. Flagstar also ignored Nussbaum's confession that he was breaching his fiduciary duties, owed to Elizabeth Capital by virtue of his position as an attorney and as escrow agent for Elizabeth Capital's deposits into the IOLA Account. Indeed, on one occasion in February 2023, Nussbaum told Flagstar, "I have a comingled account of client funds"—which was, in and of itself, a per se breach of Nussbaum's fiduciary duty. Flagstar nonetheless did nothing about it.

17. Nussbaum contacted Collins and Flagstar whenever he sent wires to new beneficiaries or wires over $10,000,000.00 (which was frequently). As a result, Nussbaum was in near constant contact with Collins and his team, and Collins and his team were expressly aware that Nussbaum was using the IOLA Account for personal payments, including payments to his family, and was transferring massive amounts of client funds out of the IOLA Account.

18. Collins and Flagstar were motivated to assist Nussbaum because, upon information and belief, their compensation was based, in part, on the size of the transactions in the IOLA Account. Moreover, Nussbaum ingratiated himself to Collins and Flagstar by referring them additional business, and by buying breakfast for Collins's office and purchasing him expensive wines.

19. At all relevant times, the IOLA Account was labeled as an "Attorney Escrow Account IOLA." Flagstar thus had actual knowledge that the IOLA Account was a trust account for client funds, and therefore had a duty to inquire when the bank became aware that Nussbaum was diverting funds from the IOLA Account for clearly improper purposes.

20. Moreover, Flagstar aided in Nussbaum's breach of fiduciary duty through its knowledge of, and assistance in concealing, Nussbaum's evidently improper: (1) commingling of

client funds; and (2) use of the IOLA account to pay millions of dollars of personal expenses, including, among other things, the cost of school tuitions for Nussbaum's family, his country club memberships, a monthly stipend to his mother, vacations, and expensive jewelry.

21. Due to Flagstar's active assistance to Nussbaum, as well as its refusal to shut down or take any action to restrict Nussbaum's use of the IOLA Account, in the course of four years from 2021 until 2025, Nussbaum Lowinger—a two-partner law firm with a small real estate practice—moved the incomprehensible sum of many billions of dollars in and out of a single law firm IOLA Account. During the fourteen-month period between March 2023 and January 2025 alone, Nussbaum wire transferred over $2 billion out of the IOLA Account in connection with his various criminal activities.

22. An attorney IOLA account (short for "Interest on Lawyer Account") holds "qualified funds," which, by law, "in the judgment of the attorney, are too small in amount or are reasonably expected to be held for too short a time to generate sufficient interest income to justify the expense of administering a segregated account for the benefit of the client or beneficial owner." See N.Y. Jud. Law § 497(2). The size of the funds, volume of transfers, and length of time that the funds described herein were supposedly held in the IOLA Account were fundamentally incongruent with those in an attorney IOLA account, which is a regulated escrow account under New York law, pursuant to Judiciary Law Section 497 and Rule 1.15 of the New York Rules of Professional Conduct.

23. As Nussbaum has since admitted under oath, there was no non-criminal explanation for the volume, size, and type of the transfers in and out of the IOLA Account. And although that was obvious to Flagstar—it did nothing about it, enabling Nussbaum to defraud his victims, such as Plaintiff Elizabeth Capital.

24. Despite its knowledge that Nussbaum was using a small law firm IOLA trust account to steal and launder billions of dollars, Flagstar did not take any remedial action to close the IOLA Account or restrict Nussbaum's use of the Account. In fact, after notifying Nussbaum that they were going to close his accounts due to "risk and compliance regulatory obligations," they allowed him to continue transacting for another month, during which time Elizabeth Capital lost over twenty million more dollars.

25. Without the active, substantial, and knowing assistance of Flagstar, Nussbaum's fraudulent schemes would not have succeeded, and Elizabeth Capital would not have suffered a loss of $148,830,000.00.

26. This action seeks recovery of that substantial loss.

## JURISDICTION AND VENUE

27. The Court has subject matter jurisdiction over this matter pursuant to Title 28, United States Code, Section 1332, based on the diversity of the citizenship of the parties and the fact that the amount in controversy exceeds $75,000, exclusive of interest and costs.

28. This Court has personal jurisdiction over Defendant Flagstar because its headquarters are in New York. Alternatively, this Court has personal jurisdiction over Defendant because it maintains offices and does substantial business in New York.

29. Venue is proper in the Southern District of New York, pursuant to Title 28, United States Code, Sections 1391(b)(2) and (d), because the Defendant maintains offices in the district, and because a substantial part of the events giving rise to the claims occurred in New York County.

## PARTIES AND RELEVANT NON-PARTIES

30. Plaintiff Elizabeth Capital is a single-member limited liability company organized and existing under the laws of the State of New Jersey with a principal place of business in

Lakewood, New Jersey. Sheldon Zafir ("Zafir") is the sole member of Elizabeth Capital, and he is a citizen of the State of New Jersey.

31. Upon information and belief, Defendant Flagstar Bank, N.A., is a federally chartered national banking association whose main office, as designated in its articles of association, is located in Hicksville, New York. Accordingly, Flagstar is a citizen of New York for purposes of diversity jurisdiction.

32. In or about March 2023, Flagstar acquired the deposits, customer relationships, and 40 branches of Signature Bridge Bank ("Signature"), which was officially closed on March 12, 2023.

33. Upon information and belief, non-party Mark J. Nussbaum is a resident of New York, New York, and during the period relevant to this action, was the principal of Nussbaum Lowinger LLP, and a separate law firm called Mark J. Nussbaum & Associates, PLLC ("MJNA"). On or about May 21, 2025, Nussbaum was arrested and charged by a New York County Grand Jury Indictment with Grand Larceny in the First Degree for, in relevant part, stealing money from the IOLA Account. On or about December 18, 2025, Nussbaum was disbarred, effective nunc pro tunc to July 9, 2025.

34. Non-party Mendel Steiner was a prominent businessman in Brooklyn. In January 2025, Steiner died by suicide, after his scheme with Nussbaum came to light.

## STATEMENT OF FACTS

### A. Nussbaum's Relationship with Flagstar

35. Nussbaum opened his own firm, MJNA, in 2015. That firm, and its successor Nussbaum Lowinger, were small firms, averaging around five attorneys at a time, with nine lawyers at their peak. The firms primarily worked on real estate deals.

36. At the beginning of his career, Nussbaum maintained attorney fiduciary accounts and operating accounts at JP Morgan Chase Bank. However, in or around 2017, JP Morgan Chase Bank closed Nussbaum's accounts due to suspicious wires originating from Russia. On information and belief, Nussbaum briefly maintained attorney fiduciary accounts at Citibank, N.A.

37. In or around 2016, Nussbaum connected with a former classmate who worked at Signature, who introduced Nussbaum to Edwin Sirlin's group (the "Sirlin Group") at Signature.

38. Nussbaum's primary point of contact at the Sirlin Group was a vice president named Timothy Collins. Collins was the account officer responsible for the IOLA Account. Although Nussbaum also had contact with other employees in the Sirlin Group, Collins remained his primary point of contact at Signature.

39. When Flagstar acquired Signature, Collins and the Sirlin Group remained Nussbaum's primary banking contacts, and his business remained with them and Flagstar.

40. As Signature's successor in interest, Flagstar became liable for Collins's and the Sirlin Group's conduct.

41. In 2020, Nussbaum partnered with Samuel Lowinger to form Nussbaum Lowinger LLP. Nussbaum then opened new accounts at Signature, including the 1550 IOLA Account. Nussbaum then had several bank accounts at Flagstar, including the IOLA Account, an operating account ending in 1542, an account ending in 0697, an account ending in 1964, and an account ending in 1972. On information and belief, Nussbaum used all of these accounts for improper purposes.

42. In or about March 2023, Signature was closed by the New York State Department of Financial Services, and Flagstar acquired all of Signature's deposits, customer relationships, and branches.

43. Collins was the vice president at Signature who was responsible for the banking relationship with Nussbaum Lowinger and MJNA. After Signature closed, Collins, alongside his team, moved to Flagstar where he and his team continued to be responsible for the banking relationship with Nussbaum Lowinger and MJNA. Collins continued in this role until April 2024, when he moved to Customers Bank, where he was almost immediately thereafter joined by Nussbaum, who opened another Nussbaum Lowinger IOLA Account at Customers Bank.

44. Flagstar continued to assist Nussbaum in the IOLA Scheme even after Collins's departure, permitting Nussbaum to continue to receive and make facially fraudulent payments. Upon information and belief, even after Collins's departure, Flagstar continued to allow Nussbaum to obtain credit increases on his accounts, despite Flagstar's awareness of Nussbaum's commingling of client money and transfers of hundreds of millions of dollars in and out of the IOLA Account.

45. On November 26, 2024, Flagstar finally closed Nussbaum's accounts, including the IOLA Account, citing "risk and compliance regulatory obligations." Nevertheless, Flagstar continued to allow Nussbaum to engage in transactions in his accounts, including the IOLA Account, until December 23, 2024.

46. Nussbaum induced Elizabeth Capital to wire over $50,000,000.00 between November 26, 2024 and December 23, 2024. Flagstar allowed these payments even though they had already decided to close Nussbaum's accounts due to "risk and compliance regulatory obligations."

**B. Nussbaum and Steiner's Commencement of the IOLA Scheme**

47. In 2021, Nussbaum met Mendel Steiner through clients. Nussbaum began to loan Steiner money. Throughout the next four years, Nussbaum loaned Steiner progressively more money.

48. In the meantime, in or around February 2021, Zafir, the principal of Elizabeth Capital, was introduced to Steiner. Zafir was subsequently informed that the Steiner family was very wealthy, that they had extensive real estate holdings in both Europe and the United States, and that Steiner ran the American side of his family's business.

49. For the next few years, Elizabeth Capital loaned Steiner funds at various points for real estate deals and was paid back. Based upon his previous dealings with Steiner, Zafir trusted Steiner.

50. In 2023, Steiner introduced Zafir to Nussbaum. Steiner told Zafir, in sum and substance, that Nussbaum was a successful lawyer who was involved in substantial real estate transactions and that Elizabeth Capital, through Nussbaum, would have the opportunity to deploy substantial capital for lending or investment.

51. Zafir then spoke to Nussbaum in or about November 2023, after which Elizabeth Capital participated, through Nussbaum, in the transactions described more fully below.

52. Zafir knew that Nussbaum was an attorney and for that reason, he trusted him. Zafir specifically understood that Nussbaum had fiduciary responsibilities to Zafir, including duties of loyalty and honesty. Those solemn professional obligations of Nussbaum were material to Zafir in inducing him to place Elizabeth Capital's money in Nussbaum's care.

53. Zafir further understood that Nussbaum would be using his attorney fiduciary account for the contemplated transactions, which Zafir understood to mean that Nussbaum's bank—Defendant Flagstar—had further responsibilities to protect the funds from misappropriation.

54. In or around November 2023, Steiner's father, Andreas Steiner, vouched for Steiner and Nussbaum to Zafir, stating that he had previously deposited significant sums, totaling tens of millions of dollars, with Nussbaum.

55. Based on his preexisting relationship with Steiner, Steiner's father's representations to Zafir, Nussbaum's status as an attorney, Zafir's understanding that Nussbaum was acting as Elizabeth Capital's attorney in all transactions, and the fact that Nussbaum was using attorney fiduciary accounts, Zafir trusted that Elizabeth Capital's funds would be safe from misappropriation at Flagstar.

56. But Nussbaum, Steiner, and Flagstar had no intention to prevent the diversion of Zafir's funds, and they instead engaged in a multiyear campaign to steal Elizabeth Capital's money.

**C. The Escrow Agreement Fraud**

57. Nussbaum and Steiner, with the knowing assistance of Flagstar, stole Elizabeth Capital's money three separate times through fraudulent escrow agreement transactions (the "Escrow Agreement Fraud").

58. With respect to each escrow agreement, Elizabeth Capital was promised orally, at or around the time the investment was made, and in writing in the escrow agreements, that its money would be kept in the IOLA Account or other escrow account maintained by Nussbaum Lowinger, untouched and risk free, until it was returned.

59. When each escrow agreement was prepared, Nussbaum replaced Steiner's name with that of an alleged "law firm client" for whom Steiner supposedly acted as the intermediary. Elizabeth Capital would learn only later that the law firm client either did not exist or was the name of an uninvolved real person that Nussbaum used to carry out the fraudulent scheme.

60. To win Elizabeth Capital's confidence and to disguise his true intentions, Nussbaum, using the name of the fictitious party, paid the first of the monthly fees due to Elizabeth Capital under the escrow agreements out of the monies deposited by Elizabeth Capital. However, the balance of Elizabeth Capital's fees were never paid, and Nussbaum immediately stole the remaining funds from the IOLA Account.

61. Even when Nussbaum did return portions of Elizabeth Capital's funds, those funds were often severely delayed from the timeline set out under the fictitious escrow agreements.

62. Pursuant to the Escrow Agreement Fraud, Elizabeth Capital made the following deposits into the IOLA Account:

- On or about November 29, 2023, Elizabeth Capital made two wire payments totaling $15,000,000.00;
- On or about December 28, 2023, Elizabeth Capital wired $21,000,000;
- On or around June 20, 2024, Elizabeth Capital wired $25,000,000.00.

63. Elizabeth Capital received the following transfers of funds from Nussbaum, which he presented as "repayments" to Elizabeth Capital. Upon information and belief, Nussbaum used funds from victims of the IOLA Scheme, including in particular Elizabeth Capital, to fund the repayments.

- On or about December 14, 2023, Elizabeth Capital received a payment of $300,000.00;
- On or about December 28, 2023, Elizabeth Capital received a payment of $300,000.00;
- On or about March 5, 2024, Elizabeth Capital received a payment of $1,860,000.00;
- On or about June 3, 2024, Elizabeth Capital received $1,440,000.00;
- On or about June 26, 2024, Elizabeth Capital received $1,650,000.00.

64. The size of these transactions, as well as the subsequent transfers of funds to Steiner's entities out of the IOLA Account, gave Flagstar clear evidence that Elizabeth Capital's funds were being mishandled, as explained further below.

**D. The Joint Venture Fraud**

65. For this part of the IOLA Scheme, and on repeated occasions as set forth below, either Steiner or Nussbaum would give Zafir, on behalf of Elizabeth Capital, a description of a property that Steiner or one of Nussbaum's clients was said to be buying, along with the name of the seller, and then asked Elizabeth Capital to: (1) fund the money needed for a deposit; or (2) participate in the purchase of the property.

66. In all cases, as revealed by Plaintiff's investigation long after the events set forth herein, Steiner's and Nussbaum's scheme was to use the fictitious joint venture to induce Elizabeth Capital to wire money into the IOLA Account so that Nussbaum and/or Steiner could steal it, with the knowing assistance of Flagstar (the "Joint Venture Fraud").

67. In order to induce Elizabeth Capital to make the investments, Nussbaum prepared fraudulent contracts and other documents containing fictitious names and forged signatures and other false information.

68. In some cases, when the agreed upon term for an investment came to an end and payment was due to Elizabeth Capital, Steiner and Nussbaum solicited Elizabeth Capital to agree to a new investment using some or all of the funds from the old investment. Upon information and belief, Steiner and Nussbaum suggested these "rollovers" so that they could continue to steal Elizabeth Capital's money without raising suspicion.

69. The Joint Venture Fraud transactions were clear evidence of mishandling of funds. Flagstar was aware of the fraud, and either did nothing to prevent it or actively assisted it.

70. Pursuant to the Joint Venture Fraud, Elizabeth Capital made the following deposits into the IOLA Account:

- On or about June 28, 2024, Elizabeth Capital wired $3,780,000.00 in two installments of $1,890,000.00;
- On or about August 6, 2024, Elizabeth Capital wired $14,000,000.00, in one increment of $5,000,000.00 and one increment of $9,000,000.00;
- On or about October 16, 2024, Elizabeth Capital wired $40,000,000.00;
- On or about November 21, 2024, Elizabeth Capital wired $25,000,000.00 in two installments of $500,000.00 and $24,500,000.00;
- On or about November 26, 2024, Elizabeth Capital wired $3,800,000.00;
- On or about November 27, 2024, Elizabeth Capital wired $450,000.00;
- On or about November 29, 2024, Elizabeth Capital wired $20,000,000.00 in three increments of $17,000,000.00, $1,500,000.00, and $1,500,000.00;
- On or about December 13, 2024, Elizabeth Capital wired $32,500,000.00 in four increments of $600,000.00, $1,000,000.00, $7,900,000.00, and $23,000,000.00.

71. Elizabeth Capital received the following transfers from Nussbaum, which he presented as "repayments" to Elizabeth Capital. Upon information and belief, Nussbaum used funds from victims of the IOLA Scheme, including in particular Elizabeth Capital, to fund the repayments.

- On or about October 29, 2024, Elizabeth Capital received $20,150,000.00;
- On or around December 2, 2024, Elizabeth Capital received $14,000,000.00;
- On or around December 3, 2024, Elizabeth Capital received $12,000,000.00, in increments of $1,000,000.00 and $11,000,000.00.

72. Nussbaum otherwise failed to return Elizabeth Capital's funds.

73. Even when Nussbaum did return portions of Elizabeth Capital's funds, those funds were often severely delayed from the timeline set out under the fictitious joint ventures.

74. The size of these transactions, as well as the subsequent transfers of funds to Steiner's entities out of the IOLA Account, gave Flagstar clear evidence that Elizabeth Capital's funds were being mishandled, as explained further below.

**E. The Unraveling of the IOLA Scheme**

75. Concerned about the tardiness of the promised return of Elizabeth Capital's funds, Zafir wrote Nussbaum on the evening of January 8, 2025, asking him to return Elizabeth Capital's funds.

76. Nussbaum never returned the funds. Instead, later that same day, Nussbaum wrote Zafir (copying Steiner) stating:

> Sheldon – I apologize for my absence and lack of correspondence the past few days. Unfortunately, I have been dealing with an emergency of epic proportions. And while this doesn't help you, I have been completely out of the picture for almost all my clients etc., these past few days. I would suggest that we all get on a call tomorrow and discuss the below. Thank you in advance for your understanding.

77. Steiner took his own life the next day, January 9, 2025.

**F. Flagstar's Awareness of the Fraud and Nussbaum's Breaches of Fiduciary Duty**

78. At all relevant times, Flagstar was aware of the fraud and was aware that Nussbaum had breached his fiduciary duty by using the IOLA Account as his "personal piggybank."

79. Throughout the course of the IOLA Scheme, Flagstar employees documented and voiced extensive concerns regarding suspicious activity in the IOLA Account. Yet they did nothing to restrict Nussbaum's use of the IOLA Account.

80. On information and belief, on no fewer than ten separate occasions from 2022 through 2025, Flagstar compliance personnel contacted Nussbaum with concerns about fraudulent or suspicious transactions in the IOLA Account, including payments for Nussbaum's mother,

round-trip transactions where millions of dollars were sent to and from the same account within days, and incomplete information on checks.

81. For example, on February 27, 2023, Flagstar employee Juan Esquilin emailed Nussbaum regarding various transactions in his accounts. Esquilin copied Collins and Martinez on this email. Specifically, Esquilin asked Nussbaum:

- "Why is a tile company sending $200,000 to a law firm?" regarding a payment from Artistic Tile to Nussbaum;
- to explain the purpose of a $100,000 payment from "IDIS Group," "a group of professionals that source industrial raw materials and other goods";
- to explain the purposes of several checks deposited without full information on the checks;
- to explain checks "paid to Ronald Lowinger with a reference of Regency Unit 429";
- to explain the purpose of a $15,000,000.00 wire sent on August 30, 2022, that returned on August 31, 2022;
- to explain why Nussbaum Lowinger LLP and Mark J. Nussbaum & Associates, PLLC were transferring money between accounts.

82. The next day, Nussbaum responded to Esquilin via written email, explaining that:

- the Artistic Tile payment was an "investment into one of my client's RE deal";
- the IDIS Group payment was also an investment into a client's deal;
- the checks were for a client, who had "deposited funds into [Nussbaum's] account for a closing, which was subsequently wired out";
- the Ronald Lowinger checks were "disbursement of proceeds from a client sale";
- the $15,000,000.00 round trip payment was a "short term loan between clients' of [Nussbaum's]"; and
- the payments between his law firm accounts were: "really [for] two reasons; one, at times based on a contract a lawyer here sends out, there is a certain amount of funds that must be in an account at a given time and two, ***clients sometimes request a printout of their account balance, as I have a comingled account of client funds, I am only able to do this, by moving funds between the accounts***. I try to avoid transferring

funds as much as possible, but as you know, the main account is NL." (Emphasis added).

83. Nussbaum thus made a stunning admission, in writing, to Flagstar: that is, that he was commingling client funds in his IOLA Account, and misrepresenting the account balance to his clients.

84. Flagstar was thus expressly aware of Nussbaum's breach of his fiduciary duties by virtue of his commingling of client funds and misrepresentations of the account balances to his clients.

85. Nussbaum's responses also put Flagstar on notice that he was engaging in fraudulent transactions.

86. Despite Nussbaum's responses, Flagstar did not shut down or restrict Nussbaum's accounts, nor did it prevent Nussbaum from continuing to move millions of dollars through the IOLA Account.

87. A different bank likely would have restricted Nussbaum's use of the IOLA Account. Indeed, upon information and belief, on or around March 14, 2023, Nussbaum stated in an email that he could not move to JP Morgan Chase, as he did not believe the bank would take him.

88. On another occasion, on June 12, 2023, Esquilin emailed Nussbaum and Esther Pick of Straight Line Property Management, copying Martinez and Collins, asking for details on a February 14, 2023 round-trip wire of $3,300,000.00 with "MJNT Properties LLC."

89. MJNT Properties LLC was also owned by Nussbaum. Flagstar knew this, as MJNT Properties LLC's bank account was also maintained at Flagstar.

90. That same day, Nussbaum responded by email, saying, "I believe this was for proof of funds and receiver wanted to see the funds in a segregated account. Accordingly we moved the money over for the POF and then back as it was not needed to stay in such account."

91. Esquilin replied to Nussbaum later that day, saying, "What was the purpose of the wire. I understand proof of funds but for what purpose? Also, need the source. Who did it come from? To whom was it sent back to?"

92. Nussbaum's response showed clear commingling of payments in his account, as well as "proof of funds" transactions. Flagstar knew or should have known that there was no legitimate business purpose for a $3,300,000.00 round-trip transaction for an attorney to provide "proof of funds" for a transaction.

93. Despite Nussbaum's responses, Flagstar did not shut down or restrict Nussbaum's accounts, nor did it prevent Nussbaum from continuing to move millions of dollars through the IOLA Account.

94. Indeed, on information and belief, on or around July 3, 2023, Nussbaum made a request to raise the limit on the IOLA Account, and Flagstar agreed to do so.

95. On July 27, 2023, Esquilin emailed Nussbaum requesting documentation for wires to Miriam Nussbaum, to congregations, and to entities with acronyms instead of full names. Esquilin flagged that an IOLA "account should not be used for personal transactions." Yet that is precisely what Nussbaum was doing. And despite its knowledge of the same, Flagstar did nothing to suspend the account.

96. On information and belief, after this compliance inquiry, Flagstar still agreed to raise the credit limit on the IOLA Account.

97. On July 28, 2023, Nussbaum responded, "Miriam is my mother and she gave loans to clients of mine and the monthly wires are return of interest on such loans."

98. On August 22, 2023, Martinez emailed Nussbaum, saying, "We need to know in what capacity is Miriam Nussbaum providing [the] loans as, is she a lender? Please provide documentation for these loans." Martinez followed up with Nussbaum on August 25, 2023.

99. Despite Flagstar having actual knowledge that Nussbaum was using an IOLA account to send money to his mother, Flagstar did not shut down or restrict Nussbaum's accounts, nor did it prevent Nussbaum from continuing to move millions of dollars through the IOLA Account.

100. On August 22, 2023, Flagstar, through Martinez, sent Nussbaum yet another list of questions about his activities. Nussbaum responded with documents.

101. On September 21, 2023, Martinez replied to Nussbaum, stating, "[t]he signature page on the $500,000.00 is missing" and "[t]he $510,000.00 & $350,000.00 are missing Signature pages."

102. Nussbaum's lack of proper documentation gave Flagstar actual knowledge that he was commingling funds and participating in fraudulent transactions.

103. Despite Flagstar's actual knowledge of Nussbaum's fraudulent activity and breaches of fiduciary duty, Flagstar did not shut down or restrict Nussbaum's accounts, nor did it prevent Nussbaum from continuing to move millions of dollars through the IOLA Account.

104. On October 27, 2023, Harish Pahuja of Flagstar emailed the Sirlin Group, copying Incident eReporting, Corporate Security, and Wire Investigations email addresses, with a message stating that JP Morgan Chase was holding Nussbaum's funds, as Nussbaum's transaction did "not fit in the normal pattern of [their] customer" and they considered the transaction "suspicious."

105. On October 30, 2023, Molick Scott of Flagstar emailed Nussbaum, copying Collins, Claudell Charlemagne, Edna Rios, and Ivelise Alicea, all from Flagstar, with the message from JP Morgan Chase. Scott said, "Hi Mark, I left you a voicemail. You never got back to me for the wire sent on Friday 10.27. Please confirm that the wire instructions were verbally confirmed with the beneficiary and [that it] is legitimate. Chase is holding the funds because it didn't fit the normal pattern of the beneficiary."

106. Flagstar was thus made aware from JP Morgan Chase that Nussbaum's transactions were suspicious and should not have gone through.

107. Put simply, prior to Elizabeth Capital's first wire into the IOLA Account in November 2023, Flagstar knew: (1) Nussbaum had been commingling the IOLA Account for the express purpose of misrepresenting the balance to clients; (2) Nussbaum was making personal payments out of the IOLA Account; (3) Nussbaum was paying his mother through the IOLA Account; and (4) Nussbaum was engaging in transactions that other banks flagged as "suspicious."

108. In spite of Flagstar's knowledge of Nussbaum's fraudulent activity and breaches of fiduciary duty, Flagstar did nothing to restrict Nussbaum's use of the IOLA Account. Indeed, on information and belief, on or around August 6, 2024, Flagstar once again increased Nussbaum's credit limit. On this same day, Elizabeth Capital wired $14,000,000.00 to the IOLA Account.

109. On information and belief, Flagstar again approved credit limit increases to Nussbaum's accounts on or around August 14, 2024, October 16, 2024 (when Elizabeth Capital wired $40,000,000.00 to the IOLA Account), and October 29, 2024.

**G. Closure of the IOLA Account and Elizabeth Capital's Continued Losses**

110. On November 26, 2024, after allowing all of these credit limit increases, Flagstar sent Nussbaum a letter, informing him that Flagstar "continuously reviews its products, markets, and clients' account base to ensure [they] are able to provide the best possible level of service,

while also meeting [their] corporate business objectives and risk and compliance obligations." Flagstar informed Nussbaum that, "[t]here are circumstances where [Flagstar] will identify one or more account relationships that no longer meet these criteria. In the best interest of [Flagstar's] clients and [Flagstar], [Flagstar] will request that these accounts be closed."

111. Flagstar then advised Nussbaum that, "pursuant to the terms and conditions of [Flagstar's] Business Bank Account Agreement and Disclosures and/or Personal Bank Account Agreements and Disclosures . . . [Flagstar] ha[d] elected to terminate the account(s) set forth on Schedule A." Those accounts were the MJNA accounts, the Nussbaum Lowinger accounts, including the IOLA Account, as well as accounts for MJNT Properties LLC, 347 Hancock Realty LLC, and 383 Herkimer Realty LLC.

112. The letter was signed by Bruce Burford, a Flagstar Relationship Manager and Vice President.

113. Despite shutting down Nussbaum's accounts, including the IOLA account, for "corporate business objectives and risk and compliance regulatory obligations," Flagstar continued to let Nussbaum make transactions in his accounts until December 23, 2024.

114. From the period between November 26, 2024, and December 23, 2024, Elizabeth Capital wired over fifty million dollars to the IOLA Account. Flagstar did nothing to prevent it, or to restrict Nussbaum's accounts, even though it had already decided to shut down Nussbaum's accounts for "corporate business objectives and risk and compliance regulatory obligations" reasons.

115. Flagstar thus knew that Nussbaum was participating in behavior that went against their "risk and compliance regulatory obligations," but allowed Nussbaum to continue to use the accounts—at the detriment of Elizabeth Capital—regardless.

**H. Flagstar's Assistance in Continuing the Fraud and Breaches of Fiduciary Duty**

116. Behind the scenes, despite its knowledge of Nussbaum's commingling and fraudulent payments, Flagstar was doing everything it could to keep Nussbaum and his money at the bank.

117. Evincing his complicity, Collins would warn Nussbaum every time that he was contacted by Flagstar compliance personnel by calling or emailing Nussbaum either immediately before, or immediately after, Nussbaum received the compliance inquiry.

118. Collins would then assist Nussbaum in concealing the fraudulent and illegal transactions by telling Nussbaum, in substance, to give as little information as possible to the Flagstar compliance team, and that Collins would make the inquiry "go away."

119. Nussbaum's account thus continued to operate despite Flagstar, through its officer Collins, knowing that there were illegal and fraudulent payments in the IOLA Account.

120. Indeed, Collins was well aware of the transactions in the IOLA Account. Nussbaum would be in contact with Collins whenever he sent wires to new beneficiaries or wires over $10,000,000.00, both of which happened regularly. As a result, Collins was aware of the transactions in the IOLA Account—in particular, Collins was expressly aware of transactions that would have put him on notice of the diversions in the Account through large payments and payments to new beneficiaries.

121. On information and belief, Collins and Flagstar made substantial sums of money from the transactions in the IOLA Account.

122. Moreover, Nussbaum referred additional business to Collins.

123. Nussbaum also bought breakfast for Collins's office and gave him gifts of expensive wine.

124. In or about April 2024, Collins moved to Customers Bank. Nussbaum then followed Collins and opened an account at Customers Bank, although he continued to use his Flagstar accounts.

125. Flagstar continued to substantially aid Nussbaum in his fraudulent activity and breaches of fiduciary duty, even after Collins's departure.

126. On information and belief, after Collins's departure, Flagstar continued to raise Nussbaum's credit limit, even as he diverted funds from the IOLA Account, commingled client and personal funds, and continued to make obviously fraudulent payments.

127. Flagstar failed to prevent the diversion of Elizabeth Capital's funds, even after Collins's departure from Flagstar.

128. After Collins's departure, Nussbaum received another inquiry from Flagstar regarding a suspicious payment. Nussbaum answered with minimal information, as he had been accustomed to doing with Collins. This time, however, Flagstar pushed back on Nussbaum's non-answer to their inquiry.

129. Flagstar communicated its decision to shut down Nussbaum's accounts on November 26, 2024, citing "risk and compliance regulatory obligations."

130. Yet, Flagstar allowed Nussbaum to continue using his accounts until December 23, 2024. From November 26, 2024 to December 23, 2024, Nussbaum stole over twenty million dollars from Elizabeth Capital through the IOLA Scheme.

131. Despite Nussbaum not answering Flagstar's inquiries, his flight to Customers Bank, and Nussbaum's extensive history of giving minimal information in response to Flagstar's inquiries, Flagstar did not restrict, monitor, or report Nussbaum's transactions or use of the IOLA

Account. Instead, Flagstar continued to allow Nussbaum to receive deposits in the IOLA Account, including from Elizabeth Capital.

132. Defendant Flagstar's wrongful conduct in relation to Nussbaum was not in isolation. In fact, Flagstar has a practice of ignoring its clients' money laundering activities, as alleged by its *own* former employees. *See* Complaint, *Marrazzo v. Flagstar Financial, Inc.*, No. 2:25-cv-04183 (July 29, 2025), ECF No. 1 at 1 ("In his new role, [the Chief Compliance Officer of Flagstar] almost immediately found that [a Director of Flagstar and former Executive Chair, President and CEO of Flagstar] had direct knowledge of a client's money laundering activities. [The Director of Flagstar] moved to interfere with [the Flagstar Chief Compliance Officer's] investigation and baldly threatened to fire him.").

133. Flagstar was aware of several categories of transactions that, on their face, constituted a violation of Nussbaum's fiduciary duties with regards to the IOLA Account. Yet Flagstar made no effort to stop Nussbaum from committing these diversions, and instead actively assisted Nussbaum in concealing these fraudulent and illegal payments.

**1) Round-Trip Transactions**

134. Flagstar had actual knowledge of Nussbaum's "round-trip" transactions, which included millions of dollars of same-day or same-week payments in and out of the IOLA Account between the same parties in an obvious attempt to cover fraudulent activity.

135. For example, Flagstar flagged an August 30, 2022 to August 31, 2022 "round-trip" transaction with ZLB Capital on February 27, 2023.

136. Flagstar also flagged a February 14, 2023 $3,300,000.00 "round-trip" transaction with MJNT Properties LLC on June 12, 2023.

137. In addition, Flagstar was aware of the following "round-trip" payments from the IOLA Account:

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| February 28, 2023 | $18,000,000.00 | The IOLA Account | Riverside Abstarct LLC [*sic*] | MJN/JS |
| February 28, 2023 | $18,000,000.00 | Riverside Abstract LLC | The IOLA Account | RACA-47009 RIVERSIDE ABSTRACT LLC XXXXXX4200 |
| May 22, 2023 | $13,000,000.00 | 529 Maple LLC | The IOLA Account | |
| May 22, 2023 | $13,130,000.00 | The IOLA Account | 529 Maple LLC | devorah |
| November 6, 2023 | $1,493,931.75 | The IOLA Account | Mesiter Abstract Corp. Escrow Account | 1501 - Prager |
| November 7, 2023 | $1,500,000.00 | Meister Abstract Corp | The IOLA Account | RENT ESCROW 1501 W 3RD ST WILLIAMSPORT PA MAPA-1095 FR<br>OM MEISTER ABSTRACT XXXXXX3900 |
| November 15, 2023 | $2,000,000.00 | The IOLA Account | Riverside Abstract, LLC | YG / File Number: RACT-50050 |
| November 16, 2023 | $2,000,000.00 | Riverside Abstract LLC | The IOLA Account | RALS JACOB BERGER RIVERSIDE ABSTRACT LLC, XXXXXX4200 |
| December 18, 2023 | $5,700,000.00 | 529 Maple LLC | The IOLA Account | |
| December 19, 2023 | $5,757,000.00 | The IOLA Account | 529 Maple LLC | Fischer |
| September 17, 2024 | $10,000,000.00 | The IOLA Account | 529 Maple LLC | Fischer |
| September 18, 2024 | $10,000,000.00 | 529 MAPLE LLC | The IOLA Account | |

138. Collins was expressly aware of these transactions, as he was in constant contact with Nussbaum regarding the IOLA Account, particularly with regards to large transactions and transactions with new people or entities.

139. On information and belief, when Flagstar flagged these round-trip transactions, Collins even *coached* Nussbaum on what to say in response. Collins told Nussbaum, in substance, to divulge as little information as possible about the transactions so that Collins could close the inquiry himself.

140. For certain inquiries, Nussbaum would even invoke attorney-client privilege, and would tell Collins that he could not answer regarding the substance of the transactions.

141. Despite Flagstar's awareness of these payments, as demonstrated by its compliance inquiries, Flagstar made no effort to shut down or otherwise restrict Nussbaum's use of his accounts.

142. No legitimate attorney escrow account would have contained the round-trip transactions contained in the IOLA Account.

**2) Family Payments**

143. Flagstar had actual knowledge of Nussbaum's payments to his family members from the IOLA Account. For example, Flagstar was aware of the following payments from the IOLA Account:

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| August 30, 2021 | $3,354.00 | The IOLA Account | Miriam Nussbaum | 150 State Street – Ira Mark Dean – Miriam Nussbaum |
| January 3, 2022 | $80,000.00 | The IOLA Account | Moshe and Miriam Nussbaum | Furman |

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| January 3, 2022 | $2,000.00 | The IOLA Account | Meister Abstract Corp. Escrow Acct | Miriam Nussbaum FL Condo purchase. |
| September 12, 2022 | $100,000.00 | The IOLA Account | Sky Roseburg LLC | Jeremy Nussbaum |
| December 1, 2023 | $2,250.00 | The IOLA Account | Joseph Kalish/Sandra Nussbaum | MJN |
| January 2, 2024 | $2,250.00 | The IOLA Account | Joseph Kalish | MJN |
| February 1, 2024 | $2,250.00 | The IOLA Account | Joseph Kalish | MJN |
| March 26, 2024 | $200,000.00 | The IOLA Account | Meister Abstract Corp. | 992 Ridge / Jeremy Nussbaum |

144. Nussbaum also had another IOLA Account for MJNA, ending in 1964 ("MJNA IOLA"). This account was also managed by Flagstar. Through the MJNA IOLA, Nussbaum often sent payments to his mother. For example, Nussbaum sent his mother the following payments:

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| February 1, 2022 | $5,750.00 | MJNA IOLA | Miriam Nussbaum | miriam nussbaum |
| February 1, 2022 | $5,833.33 | MJNA IOLA | Miriam Nussbaum | miriam nussbaum |
| May 2, 2022 | $5,750.00 | MJNA IOLA | Miriam Nussbaum | Miriam Nussbaum |
| May 2, 2022 | $5,833.33 | MJNA IOLA | Miriam Nussbaum | Miriam Nussbaum |
| March 1, 2023 | $5,750.00 | MJNA IOLA | Miriam Nussbaum | MJN |
| March 1, 2023 | $5,833.33 | MJNA IOLA | Miriam Nussbaum | MJN |

145. On July 27, 2023, Flagstar, through Esquilin, emailed Nussbaum inquiring about, in relevant part, the reasons for the wires to Miriam Nussbaum. Esquilin told Nussbaum that the MJNA IOLA "should not be used for personal transactions."

146. On July 28, 2023, Nussbaum responded to Esquilin, "Miriam is my mother and she gave loans to clients of mine and the monthly wires are return of interest on such loans."

147. On August 22, 2023, Martinez emailed Nussbaum saying, "We need to know in what capacity is Miriam Nussbaum providing loans as, is she a lender? Please provide documentation for these loans." Martinez followed up on this email on August 25, 2023.

148. On information and belief, Flagstar then instructed Nussbaum to not disburse funds to his mother directly from the IOLA Account.

149. In response to Flagstar's instructions, Nussbaum began to wire payments to his mother from the IOLA Account, passing through yet another account he held at Flagstar (ending in 1542, the "Operating Account").

150. Despite Flagstar's inquiries and flagged statement that Nussbaum's IOLA accounts "should not be used for personal transactions," Nussbaum continued to wire payments from the IOLA Account, through the Operating Account, and to his mother. For example, Nussbaum made the following payments:

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| January 2, 2024 | $7,500.00 | The IOLA Account | The Operating Account | |
| January 2, 2024 | $11,583.33 | The IOLA Account | The Operating Account | |
| January 2, 2024 | $5,750.00 | The Operating Account | Miriam Nussbaum | |
| January 2, 2024 | $5,833.33 | The Operating Account | Miriam Nussbaum | |
| July 1, 2024 | $11,583.33 | The IOLA Account | The Operating Account | |
| July 1, 2024 | $11,583.33 | The Operating Account | Miriam Nussbaum | |
| August 1, 2024 | $11,583.33 | The IOLA Account | The Operating Account | |
| August 1, 2024 | $11,583.33 | The Operating Account | Miriam Nussbaum | |

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| November 1, 2024 | $11,583.33 | The IOLA Account | The Operating Account | |
| November 1, 2024 | $11,583.33 | The Operating Account | Miriam Nussbaum | |

151. In other words, Flagstar knew that Nussbaum should not be sending money to his mother through the IOLA Account—but when Nussbaum continued to do so, using another Flagstar account (also managed by Collins) as a pass-through, Flagstar did nothing to stop him.

152. Collins was expressly aware of these transactions, as he was in constant contact with Nussbaum regarding the IOLA Account, particularly with regards to large transactions and transactions with new people or entities.

153. No legitimate attorney escrow account would have contained the family payment transactions contained in the IOLA Account, or the pass-through family payments contained in the IOLA Account and the Operating Account.

**3) Tuition Payments**

154. Flagstar had actual knowledge of Nussbaum paying school tuition at regular intervals and in automated payments through the IOLA Account. For example, Flagstar was aware of the following payments:

| Date | Amount | Sender | Recipient |
|---|---|---|---|
| **BB Tuition Mgmt Automatic Payments** | | | |
| July 3, 2023 | $2,891.00 | The IOLA Account | BB Tuition Mgmt |
| August 1, 2023 | $2,891.00 | The IOLA Account | BB Tuition Mgmt |
| September 1, 2023 | $2,891.00 | The IOLA Account | BB Tuition Mgmt |
| October 1, 2023 | $2,891.00 | The IOLA Account | BB Tuition Mgmt |
| November 1, 2023 | $2,891.00 | The IOLA Account | BB Tuition Mgmt |
| December 1, 2023 | $2,891.00 | The IOLA Account | BB Tuition Mgmt |
| January 1, 2024 | $2,891.00 | The IOLA Account | BB Tuition Mgmt |
| February 1, 2024 | $2,891.00 | The IOLA Account | BB Tuition Mgmt |
| March 1, 2024 | $2,891.00 | The IOLA Account | BB Tuition Mgmt |
| April 1, 2024 | $3,391.00 | The IOLA Account | BB Tuition Mgmt |
| **Lubavitch on the Palisades Automatic Payments** | | | |

| Date | Amount | Sender | Recipient |
|---|---|---|---|
| July 20, 2023 | $2,582.50 | The IOLA Account | Lubavitch |
| August 22, 2023 | $2,582.50 | The IOLA Account | Lubavitch |
| September 20, 2023 | $2,582.50 | The IOLA Account | Lubavitch |
| October 20, 2023 | $2,582.50 | The IOLA Account | Lubavitch |
| November 21, 2023 | $2,582.50 | The IOLA Account | Lubavitch |
| December 20, 2023 | $2,582.50 | The IOLA Account | Lubavitch |
| January 22, 2024 | $2,582.50 | The IOLA Account | Lubavitch |
| February 21, 2024 | $2,582.50 | The IOLA Account | Lubavitch |
| March 20, 2024 | $2,582.50 | The IOLA Account | Lubavitch |
| April 22, 2024 | $2,582.50 | The IOLA Account | Lubavitch |
| **Torah Academy of Boca Raton Payments** | | | |
| January 17, 2023 | $10,000.00 | The IOLA Account | Torah Academy of Boca Raton |
| August 22, 2023 | $3,405.00 | The IOLA Account | Torah Academy of Boca Raton |
| January 16, 2024 | $3,405.00 | The IOLA Account | Torah Academy of Boca Raton |
| November 5, 2024 | $3,405.00 | The IOLA Account | Torah Academy of Boca Raton |
| **Torah Academy for Girls Payment** | | | |
| March 21, 2023 | $11,800.00 | The IOLA Account | Torah Academy for Girls |
| **Ma’ayanot Yeshiva Automatic Payments** | | | |
| August 5, 2024 | $3,296.12 | The IOLA Account | Ma’ayanot Yeshiva |
| September 5, 2024 | $3,296.12 | The IOLA Account | Ma’ayanot Yeshiva |
| October 7, 2024 | $3,296.12 | The IOLA Account | Ma’ayanot Yeshiva |
| November 5, 2024 | $3,296.12 | The IOLA Account | Ma’ayanot Yeshiva |
| December 5, 2024 | $3,296.12 | The IOLA Account | Ma’ayanot Yeshiva |

155. There was no mistaking the personal nature of these payments. Indeed, a February 10, 2022, $6,000.00 payment to Lubavitch on the Palisades had the OBI, “Lily Nussbaum. Iwill program. 6th grade.”

156. Collins was expressly aware of these transactions, as he was in constant contact with Nussbaum regarding the IOLA Account, particularly with regards to large transactions and transactions with new people or entities.

157. No legitimate attorney escrow account would have contained the tuition payments contained in the IOLA Account.

**4) Payments to Charities and Religious Institutions**

158. Flagstar had actual knowledge of Nussbaum paying charities and religious institutions through the IOLA Account. For example, Flagstar was aware of the following payments:

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| September 15, 2023 | $10,000.00 | The IOLA Account | Lubavitch Youth Organization | Mendel Fischer |
| February 20, 2024 | $1,850.00 | The IOLA Account | Yeshiva High Sch Charity | |
| September 20, 2023 | $1,250.00 | The IOLA Account | Boca Jewish Center | Kugel, Yitzy |
| January 8, 2024 | $9,000.00 | The IOLA Account | Our Place in New York | MJN |

159. Collins was expressly aware of these transactions, as he was in constant contact with Nussbaum regarding the IOLA Account, particularly with regards to transactions with new people or entities.

160. Flagstar was also aware of these payments, and on July 27, 2023, flagged "wire activity associated with the congregations" for compliance purposes. Despite Flagstar's awareness of these transactions, as demonstrated by its compliance inquiries, Flagstar made no effort to shut down or otherwise restrict Nussbaum's use of his accounts.

161. No legitimate attorney escrow account would have contained the payments to religious institutions and charities contained in the IOLA Account.

**5) Mortgage Payments**

162. Flagstar also had actual knowledge of Nussbaum making mortgage payments through the IOLA Account to service loans that, upon information and belief, were personal to Nussbaum. For example, Flagstar was aware of the following payments:

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| June 14, 2024 | $4,721.73 | The IOLA Account | Shellpoint Mortgage Servicing | 350 Broadway |
| June 14, 2024 | $5,124.57 | The IOLA Account | Shellpoint Mortgage Servicing | 3838 Herkimer / XXXXXX0193 |
| June 14, 2024 | $7,843.97 | The IOLA Account | Shellpoint Mortgage Servicing | 347 Hancock |
| August 12, 2024 | $5,041.03 | The IOLA Account | Shellpoint Mortgage Servicing | BBM 350 Broadway / XXXXXX5845 |

163. Collins was also expressly aware of these transactions, as he was in constant contact with Nussbaum regarding the IOLA Account, particularly with regards to transactions with new people or entities.

164. No legitimate attorney escrow account would have contained the mortgage payments contained in the IOLA Account.

**6) Payments to Blacklisted Entities**

165. Flagstar also had actual knowledge of Nussbaum's payments to two entities blacklisted by the Federal National Mortgage Association ("Fannie Mae"): Madison Title Agency, LLC ("Madison") and Riverside Abstract, LLC ("Riverside").

166. In or around February 2024, it became a matter of public record that Madison and Riverside participated in fraudulent real estate transactions with Boruch Drillman, a New York-based commercial real estate investor who pled guilty in federal court (D.N.J.) in December 2023 to conspiracy to commit wire fraud affecting a financial institution in connection with a multi-state, $165 million mortgage fraud scheme. As a result, Fannie Mae took the extraordinary step of declining to accept delivery of any mortgage loan closed using Madison or Riverside in any capacity.

167. Flagstar was aware that Nussbaum was sending funds to these blacklisted entities through the IOLA Account. For example, Flagstar was aware of the following payments:

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| March 28, 2024 | $500,000.00 | The IOLA Account | Madison Title Agency, LLC, NJ Trus | HF / File: MTANJ - XX4003 |
| July 12, 2024 | $391,920.92 | The IOLA Account | Riverside Abstract, LLC | Opal Holdings / RANY-53333 |
| November 20, 2024 | $185,467.21 | The IOLA Account | Madison Title Agency-NY Trust | 49 Herbert St – Simkowitz, Solomon/ MTANY-XX9357 |

168. Collins was expressly aware of these transactions, as he was in constant contact with Nussbaum regarding the IOLA Account, particularly with regards to transactions with new people or entities.

169. No legitimate attorney escrow account would have contained the payments to blacklisted entities contained in the IOLA Account.

**7) Payments to Steiner's Entities**

170. Flagstar had actual knowledge of Nussbaum paying Steiner millions of dollars, primarily by wiring Steiner's entities, Aven Realty 1 LLC and Real Green Corp., funds from the IOLA Account. For example, Flagstar was aware of the following payments:

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| September 13, 2022 | $1,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| September 15, 2022 | $900,000.00 | The IOLA Account | Real Green Management Corp. | Steiner |
| September 15, 2022 | $1,600,000.00 | The IOLA Account | Real Green Management Corp. | Steiner |

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| September 21, 2022 | $120,000.00 | The IOLA Account | Real Green Management Corp. | Steiner |
| September 30, 2022 | $150,000.00 | The IOLA Account | Real Green Management Corp. | Steiner |
| September 25, 2023 | $1,000,000.00 | The IOLA Account | Real Green Management Corp. | Steiner |
| September 26, 2023 | $1,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| September 28, 2023 | $1,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| September 29, 2023 | $2,000,000.00 | The IOLA Account | Real Green Management Corp. | Steiner |
| October 18, 2023 | $500,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| October 18, 2023 | $1,100,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| October 19, 2023 | $1,200,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| October 20, 2023 | $50,000.00 | The IOLA Account | Real Green Management Corp. | Steiner |
| October 20, 2023 | $1,200,000.00 | The IOLA Account | Real Green Management Corp. | Steiner |
| October 23, 2023 | $450,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| October 23, 2023 | $620,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| October 24, 2023 | $600,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| October 26, 2023 | $100,000.00 | The IOLA Account | Real Green Management Corp. | steiner |

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| October 27, 2023 | $1,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| October 30, 2023 | $9,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| December 1, 2023 | $2,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| December 4, 2023 | $3,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| December 4, 2023 | $5,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| December 13, 2023 | $1,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| December 14, 2023 | $3,700,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| December 20, 2023 | $1,600,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| December 27, 2023 | $1,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| December 27, 2023 | $4,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| December 28, 2023 | $4,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| December 29, 2023 | $2,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| December 29, 2023 | $2,500,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| January 3, 2024 | $430,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| January 3, 2024 | $3,445,000.00 | The IOLA Account | Real Green Management Corp. | Steiner |

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| January 3, 2024 | $7,400,000.00 | The IOLA Account | Real Green Management Corp. | Steiner |
| January 9, 2024 | $1,400,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| January 9, 2024 | $3,250,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| January 16, 2024 | $4,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| January 23, 2024 | $3,500,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| January 30, 2024 | $6,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| March 11, 2024 | $2,300,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| March 13, 2024 | $5,000,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| March 21, 2024 | $450,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| March 22, 2024 | $2,500,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| March 28, 2024 | $500,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| March 29, 2024 | $2,500,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| May 6, 2024 | $670,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| May 6, 2024 | $1,600,000.00 | The IOLA Account | Real Green Management Corp. | steiner |
| June 4, 2024 | $3,000,000.00 | The IOLA Account | Aven realty | Steiner |

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| June 7, 2024 | $2,000,000.00 | The IOLA Account | Aven Realty 1 LLC | Steiner |
| June 18, 2024 | $2,400,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| June 20, 2024 | $3,400,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| June 25, 2024 | $493,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| June 25, 2024 | $500,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| June 25, 2024 | $1,650,000.00 | The IOLA Account | Aven Realty 1 LLC | Steiner |
| July 1, 2024 | $5,100,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| July 10, 2024 | $2,700,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| July 11, 2024 | $4,000,000.00 | The IOLA Account | Mendel steiner | Mendel steiner |
| July 18, 2024 | $1,000,000.00 | The IOLA Account | Mendel Steiner | Mendel Steiner |
| August 7, 2024 | $1,700,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| August 8, 2024 | $650,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| August 12, 2024 | $3,000,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| August 14, 2024 | $250,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| August 16, 2024 | $2,000,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| August 22, 2024 | $1,700,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| August 27, 2024 | $1,810,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| August 28, 2024 | $2,600,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| September 3, 2024 | $6,500,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| September 11, 2024 | $1,600,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| September 17, 2024 | $2,800,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| September 18, 2024 | $3,650,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| September 20, 2024 | $6,800,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| September 26, 2024 | $3,000,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| September 27, 2024 | $800,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| September 30, 2024 | $3,350,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| October 2, 2024 | $4,200,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| October 15, 2024 | $1,850,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| October 16, 2024 | $6,500,000.00 | The IOLA Account | Aven Realty 1 LLC | STEINER |
| October 22, 2024 | $1,500,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |
| October 29, 2024 | $3,850,000.00 | The IOLA Account | Aven Realty 1 LLC | steiner |

171. Collins was expressly aware of these transactions, as he was in constant contact with Nussbaum regarding the IOLA Account, particularly with regards to transactions with new people or entities.

172. No legitimate attorney escrow account would have contained the amount of payments to a singular person and their entities as the payments to Steiner and his entities in the IOLA Account.

**8) Other Personal Expense Payments**

173. Flagstar also had actual knowledge of Nussbaum paying obviously personal expenses through the IOLA Account. For example, Flagstar was aware of the following payments:

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| May 18, 2022 | $35,000.00 | The IOLA Account | The Rockleigh Country Club | Mark Nussbaum |
| May 23, 2022 | $17,000.00 | The IOLA Account | Time Co Watches | MJN |
| May 23, 2022 | $22,616.12 | The IOLA Account | Gold Flowers design inc. | MJN |

| Date | Amount | Sender | Recipient | OBI |
|---|---|---|---|---|
| April 25, 2023 | $4,305.00 | The IOLA Account | Prestige Lawns Inc | MJN |
| June 16, 2023 | $45,000.00 | The IOLA Account | L. Laine Jewelers LLC | Charles Berger |
| September 12, 2023 | $6,484.00 | The IOLA Account | Hoteltravelagent LLC | NUSSBAUM |
| October 16, 2023 | $100,000.00 | The IOLA Account | High end watches and jewelry inc. | Chein |
| June 18, 2024 | $6,441.00 | The IOLA Account | We Know Hotels | MJN |
| September 30, 2024 | $20,900.00 | The IOLA Account | We Know Hotels | confirmation XXXX3287 / XXXX3288 / XXXXXX6141 |

174. Collins was expressly aware of these transactions, as he was in constant contact with Nussbaum regarding the IOLA Account, particularly with regards to transactions with new people or entities.

175. No legitimate attorney escrow account would have contained the personal expense payments contained in the IOLA Account.

**9) Immediate Transfers of Elizabeth Capital's Funds**

176. Flagstar had actual knowledge that Elizabeth Capital's funds were being used for Nussbaum's Ponzi scheme.

177. Indeed, when Elizabeth Capital transferred funds to the IOLA Account, within days, Nussbaum would transfer millions of dollars of Elizabeth Capital's funds out of the IOLA Account. For example, Flagstar was aware of the following transfers:

| Date | Sender | Recipient | Amount |
|---|---|---|---|
| November 29, 2023 | Elizabeth Capital | The IOLA Account | $2,000,000.00 |
| November 29, 2023 | Elizabeth Capital | The IOLA Account | $13,000,000.00 |
| November 29, 2023 | The IOLA Account | Riverside Abstract LLC | $2,600,000.00 |

| Date | Sender | Recipient | Amount |
|---|---|---|---|
| November 29, 2023 | The IOLA Account | 529 Maple LLC | $4,100,000.00 |
| November 30, 2023 | The IOLA Account | Morgan Stanley Smith Barney LLC | $2,000,000.00 |
| December 1, 2023 | The IOLA Account | Real Green Management | $2,000,000.00 |
| December 27, 2023 | The IOLA Account | Real Green Management | $4,000,000.00 |
| December 28, 2023 | Elizabeth Capital | The IOLA Account | $21,000,000.00 |
| December 28, 2023 | The IOLA Account | Real Green Management | $4,000,000.00 |
| December 29, 2023 | The IOLA Account | Real Green Management | $2,000,000.00 |
| December 29, 2023 | The IOLA Account | Real Green Management | $2,500,000.00 |
| December 29, 2023 | The IOLA Account | Schneur Zalman Schochet | $4,040,000.00 |
| June 20, 2024 | Elizabeth Capital | The IOLA Account | $25,000,000.00 |
| June 20, 2024 | The IOLA Account | Aven Realty | $3,400,000.00 |
| June 20, 2024 | The IOLA Account | Schneur Zalman Schochet | $7,075,000.00 |
| June 20, 2024 | The IOLA Account | 529 Maple LLC | $7,492,500.00 |
| June 20, 2024 | The IOLA Account | Judah Hammer | $1,000,000.00 |
| June 20, 2024 | The IOLA Account | 529 Maple LLC | $6,565,000.00 |
| June 28, 2024 | Elizabeth Capital | The IOLA Account | $1,890,000.00 |
| June 28, 2024 | Elizabeth Capital | The IOLA Account | $1,890,000.00 |
| June 28, 2024 | The IOLA Account | Aven Realty 1 LLC | $325,000.00 |
| June 28, 2024 | The IOLA Account | RIO VISTA 2017 LLC | $75,000.00 |
| August 6, 2024 | Elizabeth Capital | The IOLA Account | $5,000,000.00 |
| August 6, 2024 | Elizabeth Capital | The IOLA Account | $9,000,000.00 |
| August 7, 2024 | The IOLA Account | Aven Realty | $1,700,000.00 |
| August 7, 2024 | The IOLA Account | OPAL FUNDING FACILITY, LLC | $1,000,000.00 |
| August 8, 2024 | The IOLA Account | Aven Realty 1 LLC | $650,000.00 |
| August 8, 2024 | The IOLA Account | Negotiable Items WD | $330,000.00 |
| August 12, 2024 | The IOLA Account | Aven Realty 1 LLC | $3,000,000.00 |
| August 16, 2024 | The IOLA Account | Aven Realty 1 LLC | $2,000,000.00 |
| October 16, 2024 | Elizabeth Capital | The IOLA Account | $40,000,000.00 |
| October 16, 2024 | The IOLA Account | Aven Realty 1 LLC | $6,500,000.00 |

| Date | Sender | Recipient | Amount |
|---|---|---|---|
| October 16, 2024 | The IOLA Account | Schneur Zalman Schochet | $17,640,000.00 |
| October 16, 2024 | The IOLA Account | 529 Maple LLC | $8,000,000.00 |
| October 16, 2024 | The IOLA Account | BKNS | $3,950,000.00 |
| October 16, 2024 | The IOLA Account | Weisman Law Firm, LLC | $1,550,000.00 |
| November 21, 2024 | Elizabeth Capital | The IOLA Account | $500,000.00 |
| November 21, 2024 | Elizabeth Capital | The IOLA Account | $24,500,000.00 |
| November 21, 2024 | The IOLA Account | Aven Realty 1 LLC | $1,000,000.00 |
| November 21, 2024 | The IOLA Account | Thalwei Abstract | $1,500,000.00 |
| November 21, 2024 | The IOLA Account | David Fischer | $5,000,000.00 |
| November 21, 2024 | The IOLA Account | Goldman Sachs Bank USA | $6,000,000.00 |
| November 21, 2024 | The IOLA Account | Schneur Zalman Schochet | $7,490,000.00 |
| November 25, 2024 | The IOLA Account | 529 Maple LLC | $3,000,000.00 |
| November 26, 2024 | Elizabeth Capital | The IOLA Account | $3,800,000.00 |
| November 26, 2024 | The IOLA Account | Aven Realty 1 LLC | $1,800,000.00 |
| November 26, 2024 | The IOLA Account | 529 Maple LLC | $5,000,000.00 |
| November 27, 2024 | Elizabeth Capital | The IOLA Account | $450,000.00 |
| November 27, 2024 | The IOLA Account | 529 Maple LLC | $4,000,000.00 |
| November 29, 2024 | Elizabeth Capital | The IOLA Account | $1,500,000.00 |
| November 29, 2024 | Elizabeth Capital | The IOLA Account | $1,500,000.00 |
| November 29, 2024 | Elizabeth Capital | The IOLA Account | $17,000,000.00 |
| November 29, 2024 | The IOLA Account | Aven Realty 1 LLC | $9,000,000.00 |
| November 29, 2024 | The IOLA Account | Schneur Zalman Schochet | $6,597,500.00 |

| Date | Sender | Recipient | Amount |
|---|---|---|---|
| November 29, 2024 | The IOLA Account | Schneur Zalman Schochet | $4,282,500.00 |
| December 13, 2024 | Elizabeth Capital | The IOLA Account | $600,000.00 |
| December 13, 2024 | Elizabeth Capital | The IOLA Account | $1,000,000.00 |
| December 13, 2024 | Elizabeth Capital | The IOLA Account | $7,900,000.00 |
| December 13, 2024 | Elizabeth Capital | The IOLA Account | $23,000,000.00 |
| December 13, 2024 | The IOLA Account | World Strong Corporation Limited | $2,080,000.00 |
| December 13, 2024 | The IOLA Account | World Strong Corporation Limited | $2,055,000.00 |
| December 13, 2024 | The IOLA Account | 529 Maple LLC | $9,970,000.00 |
| December 13, 2024 | The IOLA Account | Isidore Bleier | $3,552,500.00 |
| December 16, 2024 | The IOLA Account | Aven Realty 1 LLC | $2,600,000.00 |
| December 16, 2024 | The IOLA Account | Greenrock Capital LLC | $1,000,000.00 |

178. Collins was expressly aware of these transactions, as he was in constant contact with Nussbaum regarding the IOLA Account, particularly with regards to transactions with new people or entities.

179. The immediate payments of Elizabeth Capital's funds out of the IOLA Account left no reasonable inference but active misappropriation of client funds in the IOLA Account.

180. These payments put Flagstar on notice that Elizabeth Capital's funds were being diverted. Once put on notice of the diversion of Elizabeth Capital's funds, Flagstar was under a duty to make a reasonable inquiry to prevent that diversion. Flagstar failed to make such inquiry.

181. All of these transactions—the round-trip transactions, the family payments, the tuition payments, the payments to charities and religious institutions, the mortgage payments, the payments to blacklisted entities, the payments to Steiner's entities, the other personal expense

payments, and the immediate transfers of Elizabeth Capital's funds—were fundamentally incongruent with an attorney IOLA account, which is a regulated escrow account under New York law, pursuant to Judiciary Law Section 497 and Rule 1.15 of the New York Rules of Professional Conduct.

182. Once put on notice of the diversion of Elizabeth Capital's funds through the round-trip transactions, the family payments, the tuition payments, the payments to charities and religious institutions, the mortgage payments, the payments to blacklisted entities, the payments to Steiner's entities, the other personal expense payments, and the immediate transfers of Elizabeth Capital's funds, Flagstar had a duty to make a reasonable inquiry to prevent the diversion of Elizabeth Capital's funds. Flagstar failed to make such inquiry.

183. Any reasonably prudent bank would have noticed under these circumstances that a diversion of funds from the trust account was intended or executed.

184. But Flagstar, despite awareness of these payments, as demonstrated by its abandoned compliance inquiries, made no effort to shut down or otherwise restrict Nussbaum's use of his accounts.

185. Here, Flagstar had *actual knowledge* of the diversions, Nussbaum's fraudulent scheme, and the evidence of commingling within the IOLA. Its compliance department posed questions. But it never received satisfactory answers from Nussbaum, and took no action to prevent the diversion of Nussbaum's clients' funds.

186. Moreover, as set forth herein, Flagstar's own Vice President and agent, Collins, aided Nussbaum in concealing the fraud, breaches of fiduciary duty, and other misconduct.

**FIRST CAUSE OF ACTION**
**(Aiding and Abetting Breach of Fiduciary Duty)**

187. Plaintiff repeats and realleges each and every one of the foregoing paragraphs as if fully set forth herein.

188. Nussbaum personally, Nussbaum Lowinger, and MJNA entered into a fiduciary relationship with Elizabeth Capital both by virtue of their position as attorneys for Elizabeth Capital and as escrow agents for Plaintiff's deposits into the IOLA Account. As such, Nussbaum personally, Nussbaum Lowinger, and MJNA owed fiduciary duties to Elizabeth Capital, including, without limitation, the duties of good faith, fair dealing, honesty, fairness, full disclosure and loyalty towards Elizabeth Capital.

189. Through their theft, misappropriation, and commingling of Elizabeth Capital's funds, Nussbaum personally, Nussbaum Lowinger, and MJNA breached their fiduciary duties to Elizabeth Capital.

190. Nussbaum explicitly told Flagstar that he had a "comingled account of client funds," and that he was moving balances between his accounts in order to misrepresent the balance of the IOLA Account to his clients.

191. Furthermore, the volume, size, and amount of round-trip transactions, personal transactions, tuition payments, religious and charitable payments, payments to Nussbaum's family, mortgage payments, and other personal expenses gave rise to the sole inference that a diversion was intended and executed.

192. At all relevant times, the IOLA Account was labeled as an "Attorney Escrow Account IOLA." Flagstar thus had actual knowledge that the IOLA Account held client funds, and a duty to prevent a diversion of those funds.

193. Through the actions alleged herein, Flagstar provided substantial assistance to, and aided and abetted, Nussbaum personally, Nussbaum Lowinger, and MJNA in breaching their fiduciary duties to Elizabeth Capital. Specifically, and without limitation, Flagstar:

- Failed to act upon Nussbaum's explicit admission that he had a "comingled account of client funds" and was misrepresenting the balance of the IOLA Account to his clients;
- Failed to act upon its notice and knowledge that a diversion of funds from the trust account was intended or executed, as demonstrated by its refusal to close the account despite nine-figure sums of money moving through the account, same day round-trip transactions, payments to Nussbaum's family, tuition payments, charitable donations, mortgage payments, payments to blacklisted entities, payments to Steiner's entities, immediate transfer of Elizabeth Capital's funds, and other personal expenses paid from the IOLA Account in clear violation of Nussbaum's fiduciary duties;
- Substantially assisted Nussbaum in his breach of fiduciary duty by concealing his commingling of transactions in the IOLA Account; and
- Did not prevent the diversion of the trust funds deposited with them when confronted with clear evidence that those funds were being mishandled.

194. As a direct and foreseeable result of the foregoing, Elizabeth Capital has been damaged in an amount to be determined upon trial, but in no event less than $148,830,000.00.

## SECOND CAUSE OF ACTION
## (Aiding and Abetting Fraud)

195. Plaintiff repeats and realleges each and every one of the foregoing paragraphs as if fully set forth herein.

196. Nussbaum has admitted to defrauding Elizabeth Capital through material misrepresentations to Elizabeth Capital regarding its investments and the IOLA Account. Nussbaum knew that his representations were false, and he made those representations with the intent to induce Elizabeth Capital to rely on them.

197. Elizabeth Capital justifiably relied on Nussbaum's representations.

198. Through the actions alleged herein, Flagstar provided substantial assistance to, and aided and abetted, Nussbaum in the fraud he perpetrated against Elizabeth Capital. Specifically, and without limitation, Flagstar:

- Had actual knowledge of Nussbaum and Steiner's fraudulent scheme through Flagstar's frequent conversations with Nussbaum regarding the transactions in the IOLA Account;

- Had actual knowledge of Nussbaum's fraudulent behavior from other banks noting his transactions as "suspicious" and outside the "normal pattern";

- Substantially assisted Nussbaum in concealing his fraudulent conduct by coaching Nussbaum on how to respond to compliance inquiries;

- Substantially assisted Nussbaum by concealing the fraud so that Nussbaum could continue to operate the IOLA Account and defraud Elizabeth Capital; and

- Substantially assisted Nussbaum by not investigating or following up on expressly identified concerns regarding the IOLA Account.

199. As a direct and foreseeable result of the foregoing, Elizabeth Capital has been damaged in an amount to be determined upon trial, but in no event less than $148,830,000.00.

**<u>THIRD CAUSE OF ACTION</u>**
**(Negligence)**

200. Elizabeth Capital repeats and realleges each and every one of the foregoing paragraphs as if fully set forth herein.

201. Flagstar owed a duty of reasonable care to Elizabeth Capital to prevent the diversion of the trust funds deposited in the IOLA Account.

202. Flagstar had clear evidence, and was actually aware, that the funds in the IOLA Account were being mishandled. Yet, Flagstar took no action to prevent the diversion of those funds.

203. But for Flagstar's breach of its duty to make a reasonable inquiry into the diversion of the IOLA Account funds, Elizabeth Capital would not have lost its deposits in the IOLA Account. Specifically, and without limitation, Flagstar:

- Failed to act upon its notice and knowledge that a diversion of funds from the trust account was intended or executed, as demonstrated by its refusal to close the account despite nine-figure sums of money moving through the account, same day round-trip transactions, payments to Nussbaum's family, tuition payments, charitable donations, mortgage payments, payments to blacklisted entities, payments to Steiner's entities, immediate transfer of Elizabeth Capital's funds, and other personal expenses paid from the IOLA Account in clear violation of Nussbaum's fiduciary duties;

- Failed to make reasonable inquiry to prevent the diversion of Elizabeth Capital's funds; and

- Failed to close the IOLA Account after raising multiple suspicions regarding the transactions in the IOLA Account.

204. As a direct and foreseeable result of the foregoing, Elizabeth Capital has been damaged in an amount to be determined upon trial, but in no event less than $148,830,000.00.

## FOURTH CAUSE OF ACTION
## (Commercial Bad Faith)

205. Elizabeth Capital repeats and realleges each and every one of the foregoing paragraphs as if fully set forth herein.

206. As Nussbaum has since admitted, Nussbaum and Steiner masterminded an illegal scheme to misappropriate Elizabeth Capital's funds in the IOLA Account.

207. Flagstar, through its principal and Vice President, Timothy Collins, the officer responsible for the IOLA Account, had actual knowledge that the funds in the IOLA Account were being mishandled, amounting to bad faith. Flagstar, through Timothy Collins, was also complicit in Nussbaum's misappropriation of Elizabeth Capital's funds. Specifically, and without limitation, Flagstar:

- Failed to shut down or restrict Nussbaum's use of the IOLA Account, despite its inquiries into Nussbaum's fraudulent scheme;

- Failed to shut down or restrict Nussbaum's use of the IOLA Account, despite Nussbaum's admission that he was commingling client funds in the IOLA Account; and

- Failed to shut down or restrict Nussbaum's use of the IOLA Account, despite its knowledge of nine-figure sums of money moving through the account, same day round-trip transactions, payments to Nussbaum's family, tuition payments, charitable donations, mortgage payments, payments to blacklisted entities, payments to Steiner's entities, immediate transfer of Elizabeth Capital's funds, and other personal expenses paid from the IOLA Account.

208. As a direct and foreseeable result of the foregoing, Elizabeth Capital has been damaged in an amount to be determined upon trial, but in no event less than $148,830,000.00.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as set forth below:

A. On the FIRST CAUSE OF ACTION, judgment against Flagstar in an amount to be determined at trial, but in no event less than $148,830,000.00;

B. On the SECOND CAUSE OF ACTION, judgment against Flagstar in an amount to be determined at trial, but in no event less than $148,830,000.00;

C. On the THIRD CAUSE OF ACTION, judgment against Flagstar in an amount to be determined at trial, but in no event less than $148,830,000.00;

D. On the FOURTH CAUSE OF ACTION, judgment against Flagstar in an amount to be determined at trial, but in no event less than $148,830,000.00;

E. On all causes of action, pre-judgment interest and post-judgment interest and reasonable attorneys' fees;

F. An award of the costs and disbursements incurred in bringing this action; and

G. All such other and further relief as to the Court deems just, proper and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
October 19, 2026

Respectfully submitted,

**WALDEN HARAN WILLIAMS LLP**

By: ______________________________

Jeffrey A. Udell
Siobhan J. Allen
250 Vesey Street, 27th Floor
New York, NY 10281
Tel: (212) 335-2030
judell@whwllp.com
sallen@whwllp.com

*Attorneys for Plaintiff Elizabeth Capital Success LLC*